THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

PERDITA TAYLOR                :

     Plaintiff               :

     v.                   :      Case No.: 1:07-CV-01394 - RCL

D.C. DEPARTMENT OF CORRECTIONS, *et al.*  :

     Defendants         :

## DEFENDANT DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS' MOTION TO DISMISS, OR ALTERNATIVELY, FOR SUMMARY JUDGMENT

COMES NOW Defendant District of Columbia Department of Corrections ("DOC"), by and through counsel, Gleason, Flynn, Emig & Fogleman, Chartered, and pursuant to Federal Rules of Civil Procedure 12(b) and 56(c), hereby moves for the dismissal of Plaintiff's claims against it, or alternatively, the grant of summary judgment in its favor. The *pro se* plaintiff is a prison inmate incarcerated in Lexington, Kentucky, and consequently, she could not be reached for consent to this motion or the relief requested herein. As grounds for its motion, Defendant DOC states: (i) that Plaintiff has failed to state a case upon which relief can be granted; (ii) that service of process upon Defendant DOC was insufficient; and (iii) Plaintiff has failed to name the proper defendant. As alternative grounds for its motion, Defendant DOC states: (i) that there is no dispute as to any material fact in this matter; and (ii) that Defendant DOC is entitled to judgment as a matter of law.

WHEREFORE, for the foregoing reasons and those more fully set forth in the memorandum of points and authorities attached hereto, Defendant DOC respectfully requests that the Court dismiss Plaintiff's claims against it, or alternatively, grant summary judgment in

its favor, and that the Court grant such other relief as is just and proper.

Respectfully submitted,

GLEASON, FLYNN, EMIG &
FOGLEMAN, CHARTERED

_____/s/ Michael F. Flynn, Jr._____
Michael F. Flynn, Jr. (Bar No.: 351304)
mflynn@gleason-law.com

_____/s/ Larry D. McAfee_____
Larry D. McAfee (Bar No.: 457226)
lmcafee@gleason-law.com
11 North Washington Street, Suite 400
Rockville, Maryland 20850
(301) 294-2110
**Attorneys for Defendant District of
Columbia Department of Corrections**

## REQUEST FOR HEARING

Defendant District of Columbia Department of Corrections, by and through counsel,
respectfully requests a hearing on all issues raised herein.

_____/s/ Larry D. McAfee_____
Larry D. McAfee (Bar No.: 457226)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31st day of January 2008, a copy of the foregoing
Defendant District of Columbia Department of Corrections' Motion to Dismiss, or Alternatively, for
Summary Judgment and proposed Order were mailed, first class, postage prepaid to:

Perdita Taylor (DCDC # 205088)
FPC Lexington, P.O. Box 14525
Lexington, Kentucky 40512

Charlotte A. Abel, Esquire
U.S. Attorney's Office, Civil Division
501 3rd Street N.W., 4th Floor
Washington, D.C. 20001
charlotte.abel@usdoj.gov

_____/s/ Larry D. McAfee_____
Larry D. McAfee

2

THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

PERDITA TAYLOR                                    :

    Plaintiff                                :

    v.                                       :          Case No.: 1:07-CV-01394 - RCL

D.C. DEPARTMENT OF CORRECTIONS, *et al.*   :

    Defendants                               :

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS' MOTION TO DISMISS, OR ALTERNATIVELY, FOR SUMMARY JUDGMENT

Defendant District of Columbia Department of Corrections ("DOC"), by and through counsel, has filed a motion in the above-captioned case, seeking the dismissal of, or alternatively summary judgment in its favor as to, Plaintiff's allegations in the above-captioned case. Defendant DOC submits that the case *sub judice* should be dismissed against him because Plaintiff has failed to state a claim against this defendant upon which relief may be granted. Specifically, Plaintiff has failed to exhaust her administrative remedies and failed to provide Defendant DOC with the required 90-day notice of her intention to sue, pursuant to the D.C. Medical Malpractice Statute, codified at D.C. CODE ANN. §16-2801 *et seq*. Additionally, providing healthcare to inmates is a delegable duty, for which Defendant DOC is not responsible. Defendant DOC also submits that Plaintiff has failed to name the proper party defendant in this case, and service upon the District of Columbia, the proper defendant, was insufficient. Defendant DOC alternatively submits that there is no dispute as to any material fact germane to the issues set forth above,[1] and consequently, it is entitled to judgment as a matter of law. This

---

1.    The Court is referred to the Statement of Material Facts Not In Dispute, attached hereto as Exhibit A, for all non-disputed material facts that are germane to the instant motion.

memorandum of points and authorities is submitted in support of Defendant DOC's motion to dismiss, or alternatively, for summary judgment.

## FACTUAL BACKGROUND

Plaintiff Taylor filed the Complaint, initiating the above-captioned case, on July 31, 2007. See generally Complaint. Plaintiff alleges that she was incarcerated at the D.C. Jail, on November 18, 2006. Id. at 1. Plaintiff alleges that she fell off of her bunk and was injured the same night of her incarceration. Id. She alleges that, on November 23, 2006, she reported her injury to the "nurse on duty, on the unit," who prescribed her Tylenol.[2] Plaintiff Taylor alleges that eight days after seeing the nurse on duty, she was seen at sick call by Negash Testerman, M.D. Id. According to Plaintiff Taylor, Dr. Testerman also prescribed her Tylenol, and additionally, he ordered a wrist splint and an x-ray. Id. Plaintiff alleges that the healthcare providers at the D.C. Jail, however, failed to comply with Dr. Testerman's order for a wrist splint and an x-ray. Id.

Plaintiff further alleges in her Complaint that, on December 6, 2006, she was transferred to the Correctional Corporation of America ("CCA"), a housing contractor for the D.C. Jail and Federal Inmates. Id. at 1-2. Plaintiff alleges that, even though the medical staff at CCA was the same as those at the D.C. Jail, she did not receive her x-ray until December 21, 2006. Id. at 2. Plaintiff Taylor alleges that, through mid-January, she was assured by a nurse from Co-Defendant Unity Health Care Providers (hereinafter, "Unity"), as well as an orthopaedic physician, that her x-ray was normal. Id.

---

2.      Although Plaintiff alleges that she "continuously endured pain while on the intake tier," she does not allege in her Compliant that she reported this pain to anyone at the D.C. Jail, until "November 23, 2006, [when] the pain became unbearable." Complaint at 1.

Plaintiff Taylor alleges that, on February 12, 2007, she was transferred to the custody of the Bureau of Prisons ("BOP") in Lexington, Kentucky. Id. Plaintiff alleges that, on April 4, 2007, she was "screened and x-rayed" and informed ostensibly for the first time that she had suffered a broken wrist from the fall off of her bunk. See id. Plaintiff alleges that she has suffered injury, as a result of the alleged delay in diagnosis and treatment of her broken wrist. Id. at 2-3. She seeks punitive and compensatory damages for her pain and suffering and her alleged permanent disability. Id. at 3.

At the time of Plaintiff's fall from her bunk, the District of Columbia had contracted with Co-Defendant Unity to provide healthcare to inmates at the D.C. Jail. See Award/Contract, attached hereto as Exhibit B.[3] The healthcare providers, including the nurses and physicians, who provided care to the plaintiff, were employed by Co-Defendant Unity. See id.

## ARGUMENT

A motion under Rule 12(b)(6) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P.") tests the legal sufficiency of a complaint. Browning v. Clinton, 292 F.3d 235, 242 (D.C. Cir. 2002). Dismissal is appropriate if the plaintiff can prove no set of facts which would entitle him or her to relief. Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Court must accept the plaintiff's factual allegations as true and construe the complaint liberally, granting the plaintiff the benefit of inferences that can be derived from the facts alleged. Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994). However, the Court must reject all "inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint," and/or "legal conclusions cast in the form of factual allegations." Browning, 292

---

3.    The Award/Contract is provided in relevant part only, as the entire contract is in excess of 80 pages. Also, financial information has been redacted.

3

F.3d at 242 (citing <u>Kowal</u>, 16 F.3d at 1275). When matters outside the pleadings are submitted with a Rule 12(b) motion to dismiss, "the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 . . . ." Fed.R.Civ.P. 12(b).

Under Rule 56, summary judgment is appropriate if the pleadings on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250 (1986); <u>Burke v. Gould</u>, 286 F.3d 513, 517 (D.C. Cir. 2002). Material facts are those that "might affect the outcome of the suit under the governing law." <u>Anderson</u>, 477 U.S. at 248. The Supreme Court has held that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 327 (1986)(quoting Fed.R.Civ.P. 1). A genuine dispute of material fact may not be created by a party through speculation. <u>Simpkins v. Washington Metro. Area Transit Auth.</u>, 2 F.Supp.2d 52, 57 fn. 6 (D.D.C. 1998)(citing with approval <u>Dotson v. United States Postal Serv.</u>, 977 F.2d 976, 978 (6th Cir. 1992)). Rather, the non-moving party must demonstrate that admissible evidence exists to support its claims should the case proceed to trial. <u>Celotex</u>, 477 U.S. at 327.

Viewed against either the dismissal or summary judgment standard, for the reasons that follow, Plaintiff's claims against Defendant DOC in the case *sub judice* are defective and should not be allowed to proceed. Consequently, the claims against Defendant DOC must be dismissed, or alternatively, summary judgment should be granted in this defendant's favor.

I.    **Plaintiff's Complaint Fails to State a Claim Against Defendant DOC Upon Which Relief May be Granted.**

    A.    **Plaintiff Failed to Exhaust Her Administrative Remedies.**

Plaintiff's claims against Defendant DOC must be dismissed because she failed to comply with the exhaustion of administrative remedies requirement of the Prison Litigation Reform Act ("PLRA") of 1995. The PLRA provides:

> (a)    Applicability of administrative remedies.
>
> No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.
>
> . . .
>
> (c)    Dismissal
>
> (1) The court **shall** on its own motion or on the motion of a party dismiss any action brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility if the court is satisfied that the action is frivolous, malicious, *fails to state a claim upon which relief can be granted*, or seeks monetary relief from a defendant who is immune from such relief.
>
> (2) In the event that a claim is, on its face, frivolous, malicious, *fails to state a claim upon which relief can be granted*, or seeks monetary relief from a defendant who is immune from such relief, the court may dismiss the underlying claim without first requiring the exhaustion of administrative remedies.

See 42 U.S.C. § 1997e (2002)(emphasis added). The PLRA defines "prisoner" broadly as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." 42 U.S.C. § 1997e(h); see also LaFontant v. INS, 135 F.3d 158, 165 (D.C. Cir. 1998).

5

The mandates of the PLRA apply to Plaintiff Taylor in this case. At the time Plaintiff Taylor filed her Complaint, she was a prisoner with the District of Columbia. Thus, she falls within the broad definition of "prisoner" as set forth in the plain language of the PLRA. Plaintiff's complaints against the DOC relate to her placement and conditions of confinement while incarcerated. The Supreme Court has made clear that *"the PLRA's exhaustion requirement applies to **all inmate suits about prison life**, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."* Porter v. Nussle, 534 U.S. 516, 532 (2002)(emphasis added); Cf. Artis-Bev v. District of Columbia, 884 A.2d 626 (D.C. 2005)(Trial court erred in dismissing state common law tort claims for failure to meet the PLRA's exhaustion requirement.). The Supreme Court also has held that an inmate must fully exhaust the grievance procedure offered regardless of whether that procedure offered the remedy the inmate sought. Booth v. Churner, 532 U.S. 731, 738 (2001).[4] Therefore, Plaintiff was required to exhaust the administrative remedies available to her before filing the instant action.[5]

In the case *sub judice*, the Department of Corrections has administrative procedures for inmate grievances. If an inmate, held in a District of Columbia Department of Corrections'

---

4.    Although the District of Columbia Court of Appeals in Artis-Bev cites the Supreme Court's holdings in Porter and Booth, it did not reconcile its contradictory holding with these cases. Consequently, Defendant DOC submits that this Court should follow the Supreme Court's holdings in Porter and Booth, that **all** claims by prisoners, whether federal or state common law, are subject to the exhaustion of administrative remedies requirements of the PLRA.

5.    It should be noted that by operation of the Federally Supported Health Centers Assistance Act ("FSHCAA")(42 U.S.C. § 233(g)-(n)), Unity Health Care, Inc. (formerly known as Health Care for the Homeless Project, Inc.), to whom Defendant DOC delegated the responsibility to provide healthcare to its inmates (see section IB *infra*), is covered under the Federal Tort Claims Act ("FTCA")(28 U.S.C. §§ 1346(b), 2401(b), 2671-80). Consequently, the allegations of medical negligence in this case are covered by the FSHCAA, and the

facility, wanted to file a grievance, he or she would first be encouraged to resolve the matter informally. <u>See</u> Program Statement - Inmate Grievance Procedure ("IGP"), attached hereto as Exhibit C at pg. 5. If the matter is not resolved informally, the inmate could then file a formal grievance with the DOC Community Residential Programs (CRP) Administrator. <u>See id</u>. at pp. 5-10. If the inmate wishes to appeal the decision of the Warden, he or she can do so by filing the appeal with the Deputy Director. <u>Id</u>. at 10-11. If he or she wishes to appeal the final decision by the Deputy Director, she can do so as outlined in the Appeals Process - Final Level section of the IGP. <u>Id</u>. at 11. An explanation of the administrative procedures process is provided to all inmates upon arrival at a detention facility and inmates can ask any questions about the procedure. <u>Id</u>. at 4. Grievance procedures are posted on bulletin boards in the prison and in inmate publications. <u>See id</u>. at 12.

In the instant case, Plaintiff has never filed a formal grievance or exhausted her administrative remedies. <u>See</u> Declaration of Sgt. Aden Bushee ("Bushee Aff."), attached hereto as Exhibit D at ¶¶ 2-3; <u>see also</u> Declaration of Meredith Torres ("Torres Aff."), attached hereto as Exhibit E. at ¶ 4. As the Supreme Court held in <u>Jones v. Bock</u>, U.S. 127 S.Ct. 910, 921 (2007), the PLRA exhaustion requirement is an affirmative defense and the defendant bears the burden of proving a prisoner's failure to exhaust his administrative remedies.[6] Defendant DOC

---

plaintiff's exclusive remedy may be provided by the FTCA. Accordingly, Plaintiff may also have been required to exhaust her administrative remedies, pursuant to 28 U.S.C. § 2675.

6.      Although Plaintiff claims that "[i]nmate grievances were filed regarding the neglect of the doctor's orders and for not receiving my x-ray results" (Complaint at 2), no such grievances were found by either Ms. Torres or Sgt. Bushee during their investigations. A genuine dispute of material fact may not be created by a party through speculation and conjecture. <u>Simpkins</u>, 2 F.Supp.2d at 57 fn. 6; <u>Dotson</u>, 977 F.2d at 978. Rather, the non-moving party must demonstrate that **admissible evidence** exists to support its claims should the case proceed to trial. <u>Celotex</u>, 477 U.S. at 327. Plaintiff has not submitted any evidence that she in fact filed a grievance, other than her contentions in the Complaint, which were not made under oath. Plaintiff has not attached or cited any document evidencing the filing of an

has met its burden and the Court should dismiss Plaintiff's lawsuit and permit the Department of Corrections the opportunity to resolve this matter administratively and eliminate the need for judicial action.   Therefore, assuming the truth of all allegations in the Complaint,  Plaintiff's claims against Defendant DOC must be dismissed, or alternatively, summary judgment should be granted in its favor, because Plaintiff has failed to exhaust her administrative remedies prior to initiating suit before this Court.

**B.     Defendant DOC Is Not Vicariously Liable for Medical Negligence Allegedly Committed by Independent Contractors To Whom Defendant DOC Has Delegated the Responsibility to Provide Healthcare Services to Its Inmates.**

Plaintiff's Complaint must be dismissed against Defendant DOC because the plaintiff's allegations of medical negligence arise out of the conduct of independent contractors to whom Defendant DOC had delegated the responsibility to provide medical care and treatment to her.  In light of this delegation of responsibility, Defendant DOC is not vicariously liable for the independent contractor's conduct.  See Herbert v. District of Columbia, 716 A.2d 196 (D.C. 1998) (*en banc*).

In Herbert, a prisoner sued the District of Columbia, its independent contractor corporate health care provider, and physicians and physician's assistant employed by the provider, claiming that she received improper medical treatment while incarcerated.  Id. at 197-98.  The Herbert Court *en banc* considered whether the District's duty to provide the inmate with non-negligent medical care was delegable, and if so, whether the District was liable for the negligence of the independent contractors to whom the duty had been delegated.  Id. at 198.  The District of Columbia Court of Appeals held that the District may delegate its statutory obligation to provide

---

administrative grievance.  Plaintiff's bare assertion that she filed such a grievance should not give rise to a genuine issue as to a material fact, particularly considering the sworn affidavits of the officials responsible for tracking such grievances.

medical care to inmates to an independent contractor and thereby avoid common law liability for the torts of those medical providers. Id. at 198-201.

Similarly, in the case *sub judice*, the "medically negligent" care alleged in Plaintiff's Complaint was provided by nurses and physicians employed by Co-Defendant Unity Health Services. See Award/Contract; see also Torres Aff. at ¶ 6. Plaintiff claims that "[t]he nurse on duty, on the unit, saw me and gave me Tylenol without performing any type of exam." Complaint at 1. Plaintiff alleges that Dr. Testerman, an employee of Co-Defendant Unity, ordered a wrist splint and an x-ray, which she did not receive. Id. Plaintiff claims that after she received her x-ray, a nurse from Co-Defendant Unity and an orthopaedist who subsequently examined her both advised her that her x-ray was normal. Id. at 2. According to Plaintiff, none of her healthcare providers recognized that she had a broken wrist or treated it. See generally id.

Defendant DOC delegated to Co-Defendant Unity the responsibility to diagnose and treat inmates' medical conditions, like the broken wrist allegedly suffered by Plaintiff. See Award/Contract. Defendant DOC was entitled to delegate this responsibility to Co-Defendant Unity, and as a matter of law, Defendant DOC cannot be held vicariously liable for the alleged negligent care by the co-defendant. See Herbert, 716 A.2d at 199. Therefore, assuming the truth of the matters asserted by Plaintiff in her Complaint, Plaintiff's claims against Defendant DOC must be dismissed, or alternatively, summary judgment should be granted in its favor because Defendant DOC legally is not vicariously liable for the alleged negligent medical care and treatment provided to Plaintiff Taylor.

## C.    Plaintiff's Claims Against Defendant DOC Are Barred By the D.C. Medical Malpractice Statute.

Plaintiff claims in her Complaint allege that the healthcare providers at the D.C. Jail failed to timely diagnose and treat her broken wrist. See id. By its terms, Plaintiff's Complaint

9

seeks to recover for medical malpractice allegedly committed by the healthcare providers at the D.C. Jail. See id. Effective March 14, 2007, "any person who intends to file an action in the court alleging medical malpractice against a healthcare provider shall notify the intended defendant of his or her action not less than 90 days prior to filing the action." D.C. CODE ANN. §16-2802(a) (2001).[7] *"A legal action alleging medical malpractice* shall *not be commenced in the court unless the requirements of this section have been satisfied."* Id. at §16-2802(c) (emphasis added).[8]

Plaintiff filed her medical malpractice suit against Defendant DOC, on July 31, 2007. Plaintiff never provided Defendant DOC notice of her intention to file suit against this defendant at least ninety (90) days prior to filing her medical malpractice suit. See Bushee Aff. at ¶ 4. Because the statute provides that a medical malpractice suit "**shall not** be commenced in the court unless the requirements of this section have been satisfied," and because Plaintiff failed to comply with the mandatory requirements of that statute, her claims against Defendant DOC are barred. See D.C. CODE ANN. §16-2802(c). Consequently, even assuming the truth of all allegations in the Complaint, Plaintiff's claims against Defendant DOC must be dismissed, or alternatively, summary judgment should be granted in its favor.

---

7.    For purposes of this case and Plaintiff's allegations herein, Defendant DOC should be considered a healthcare provider within the definition provided by § 16-2801(2) because Plaintiff's medical care and treatment was provided at the defendant's sick call facility (*i.e.*, a "health center"), and Defendant DOC is authorized under District of Columbia law to provide health service" at its sick call facilities, through the independent contractors to whom it delegates this responsibility.

8.    Although the District of Columbia courts have not yet addressed this issue, primarily because of the recent enactment of the statute, Maryland Courts, where there is a similar medical malpractice statute, have held that Federal courts exercising diversity jurisdiction over medical negligence cases must also comply with the requirements of its medical

**II.    Plaintiff Has Failed To Name the Proper Defendant.**

Plaintiff's Complaint against the Defendant DOC also should be dismissed for lack of personal jurisdiction over this defendant. It is a well-established that agencies and departments within the District of Columbia government cannot be sued as separate entities. Fields v. District of Columbia Department of Corrections, 789 F.Supp. 20, 22 (D.D.C. 1992); Gales v. District of Columbia, 47 F. Supp. 2d 43, 48 (D.D.C. 1999).

Defendant DOC is an entity of the District of Columbia government, and therefore, it cannot be sued as a separate defendant from the District. In Reginald Parker v. District of Columbia, the Federal District Court dismissed a plaintiff's complaint against the District of Columbia Commission on Mental Health Services (DCCMHS), when the Plaintiff failed to name the District of Columbia as a defendant. 216 F.R.D. 128, 2002 U.S. Dist. Lexis 26663 (D.D.C. 2002). The Court found that the DCCMHS was an entity of the District of Columbia, and therefore, was not a separate legal entity capable of being sued. The Court of Appeals has also held that a suit against an entity of the District of Columbia government should not be treated as one naming the District of Columbia as a defendant. See Kelly v. Morris, 400 A.2d 1045 (D.C. 1979). Instructively, this Court should find that Defendant DOC is not an entity capable of being sued and that the proper defendant, the District of Columbia, is not presently before the Court. Therefore, Defendant DOC should be dismissed from this case because this Court does not have jurisdiction over this named defendant.

**III.    Plaintiff Failed to Provide Proper Service to The District of Columbia.**

Plaintiff's Complaint should be dismissed because she has failed to properly serve the District of Columbia, the proper party defendant, as she failed to serve Mayor Adrian Fenty.

---

malpractice statute. See generally Davidson v. Sinai Hosp. of Baltimore, Inc., 462 F.Supp.

Fed.R.Civ.P. 4(j)(2) governs the service of process upon, *inter alia*, municipal corporations such as the District of Columbia. Specifically, Rule 4(j)(2) provides that, "[s]ervice upon a . . . municipal corporation . . . shall be effected by delivering a copy of the summons and of the complaint to its chief executive officer or by serving the summons and complaint in the manner prescribed by the law of that state for the service of summons or other like process upon any such defendant." Fed. R. Civ. P. 4(j)(2).

The Superior Court Civil Procedure Rules (Super.Ct.R.Civ.P.") provide that:

> [s]ervice shall be made upon the District of Columbia by delivering (pursuant to paragraph (c)(2)) or mailing (pursuant to paragraph (c)(3)) a copy of the summons, complaint and initial order to the Mayor of the District of Columbia (or designee) and the Corporation Counsel of the District of Columbia (or designee). The Mayor and the may each designate an employee for receipt of service of process by filing a written notice with the Clerk of the Court.

Super.Ct.R.Civ.P. 4(j)(1). Because Plaintiff failed to serve Mayor Fenty in accordance with Super.Ct.R.Civ.P. 4(j)(1) her Complaint should be dismissed.[9]

## CONCLUSSION

Plaintiff's Complaint fails state a claim against this defendant upon which relief may be granted because she has failed to exhaust her administrative remedies and failed to provide Defendant DOC with the required 90-day notice of her intention to sue, and because Defendant DOC is not responsible for the alleged negligence of the independent contractors to whom it delegates responsibility to provide healthcare services. Plaintiff has also failed to name the proper party defendant in this case and service upon the District of Columbia, the proper

---

778 (D. Md. 1978).

9.    Even if Plaintiff had served the Mayor, it is unknown whether she gave the required notice, pursuant to D.C. CODE ANN. § 12-309 within six months after she sustained her injury.

defendant, was insufficient. There is no dispute as to any material fact germane to these issues, and Defendant DOC is entitled to judgment on these issues as a matter of law. Therefore, the Court should dismiss Plaintiff's claims against Defendant DOC, or alternatively, grant summary judgment in its favor.

Respectfully submitted,

GLEASON, FLYNN, EMIG &
FOGLEMAN, CHARTERED
_____/s/ Michael F. Flynn, Jr._____
Michael F. Flynn, Jr. (Bar No.: 351304)


_____/s/ Larry D. McAfee_____
Larry D. McAfee (Bar No.: 457226)
11 North Washington Street
Suite 400
Rockville, Maryland 20850
(301) 294-2110

**Attorneys for Defendant District of the
Columbia Department of Corrections**

THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

PERDITA TAYLOR                                    :

    Plaintiff                                   :

    v.                                          :    Case No.: 1:07-CV-01394 - RCL

D.C. DEPARTMENT OF CORRECTIONS, *et al.*    :

    Defendants                                  :

## ORDER DISMISSING CLAIMS AGAINST DEFENDANT DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS

UPON CONSIDERATION of Defendant District of Columbia Department of Corrections' Motion to Dismiss, or Alternatively, for Summary Judgment, Plaintiff's Opposition thereto, and the entire record herein, it is this _____ day of February 2008

ORDERED that Defendant District of Columbia Department of Corrections' Motion to Dismiss, or Alternatively, for Summary Judgment, be, and the same hereby is, GRANTED; and it is further

ORDERED that the Complaint against Defendant District of Columbia Department of Corrections is dismissed; or it is

ORDERED that summary judgment is granted in favor of Defendant District of Columbia Department of Corrections, against Plaintiff Perdita Taylor.

 

 

_____
JUDGE ROYCE C. LAMBERTH,
UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

Copies to:

Perdita Taylor (DCDC # 205088)
FPC Lexington
P.O. Box 14525
Lexington, Kentucky 40512

Michael F. Flynn, Jr., Esquire
Larry D. McAfee, Esquire
Gleason, Flynn, Emig & Fogleman, Chartered
11 North Washington Street
Suite 400
Rockville, Maryland 20850
lmcafee@gleason-law.com

Charlotte A. Abel, Esquire
U.S. Attorney's Office, Civil Division
501 3rd Street N.W., 4th Floor
Washington, D.C. 20001
charlotte.abel@usdoj.gov

THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

PERDITA TAYLOR                                    :

    Plaintiff                                    :

    v.                                           :        Case No.: 1:07-CV-01394 - RCL

D.C. DEPARTMENT OF CORRECTIONS, *et al.*          :

    Defendants                                   :

## **EXHIBITS**

EXHIBIT A        Statement of Material Facts Not In Dispute

EXHIBIT B        Award/Contract

EXHIBIT C        Program Statement - Inmate Grievance Procedure

EXHIBIT D        Declaration of Sgt. Aden Bushee

EXHIBIT E        Declaration of Meredith Torres

THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

PERDITA TAYLOR                                          :

     Plaintiff                                   :

     v.                                          :          Case No.: 1:07-CV-01394 - RCL

D.C. DEPARTMENT OF CORRECTIONS, *et al.*    :

     Defendants                                  :

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1.    The District of Columbia contracted with Unity Health Care, Inc., to provide healthcare to inmates the Department of Corrections. <u>See</u> Award/Contract. The healthcare providers, including the nurses and physicians, who provided care to the plaintiff, were employed by Unity Health Care, Inc. <u>See</u> <u>id</u>.

2.    Plaintiff has never filed a formal grievance or exhausted her administrative remedies regarding her claims in this case. <u>See</u> Affidavit of Sgt. Aden Bushee at ¶¶ 2-3; <u>see also</u> Declaration of Meredith Torres, attached hereto as Exhibit D. at ¶ 4.

3.    The District of Columbia delegated the responsibility to provide healthcare at the Department of Corrections, including the diagnosis and treatment of inmates' medical conditions, to Unity Health Care, Inc.. <u>See</u> Award/Contract.

4.    Plaintiff filed her medical malpractice suit against the Department of Corrections, on July 31, 2007. <u>See</u> Complaint. Plaintiff never provided Defendant Department of Corrections with notice of her intention to file suit against it within ninety (90) days prior to filing her medical malpractice suit. <u>See</u> Affidavit of Sgt. Aden Bushee at ¶ 4.



EXHIBIT

A

5.    The Department of Corrections is an agency of t he District of Columbia and an entity that is not capable of being sued.  Plaintiff sued the Department of Corrections and not the District of Columbia.  See Complaint.

6.    Plaintiff failed to serve Mayor Fenty in accordance with Super.Ct.R.Civ.P. 4(j)(1).

Respectfully submitted,

GLEASON, FLYNN, EMIG & FOGLEMAN, CHARTERED

_____ /s/ Michael F. Flynn, Jr._____
Michael F. Flynn, Jr. (Bar No.: 351304)

_____ /s/ Larry D. McAfee_____
Larry D. McAfee (Bar No.: 457226)
11 North Washington Street, Suite 400
Rockville, Maryland 20850
(301) 294-2110

**Attorneys for Defendant District of the Columbia Department of Corrections**

2

# AWARD/CONTRACT

| 1. Reserved for later use | | Page of Page |
|---|---|---|

| 2. Contract Number | 3. Effective Date |
|---|---|
| DCFL-2006-D-6001 | See block 20c |

| | Page | of |
|---|---|---|
| | 1 | 81 |

**4. Requisition/Purchase Request/Project No.**

**5. Issued By:**     Code   07SRC

Office of Contracting and Procurement
Group vii
441 4th Street, NW, Suite 700 South
Washington, D.C. 20001

**6. Administered by (If other than line 5)**
Department of Corrections
1923 Vermont Avenue, N.W.
Washington, DC 20001

**7. Name and Address of Contractor (No. street, city, county, state and Zip Code)**

Unity Heath Care, Inc.
3020 14th Street, NW
Washington, DC 20009
Attn: Vincent A. Keane
Phone: (202) 518-6409

| Duns No. 18-714-4019 | TIN 52-1572431 |
|---|---|

**8. Delivery**
☐ FOB Origin    ☒ Other

**9. Discount for prompt payment**

**10. Submit invoices to the Address shown in Section G.2 (2 copies unless otherwise specified)**

| 11. Ship to/Mark For | Code |
|---|---|
| N/A | |

**12. Payment will be made by**     Code
Office of the Controller
300 Indiana Avenue, NW, Room 4106
Washington, DC 20001

**13. Remit Address:**

**14. Accounting and Appropriation Data**
ENCUMBRANCE CODE:

| 15A. Item | 15B. Supplies/Services | 15C. Qty. | 15D. Unit | 15E. Unit Price | 15F. Amount |
|---|---|---|---|---|---|
| 0001 | Transition Cost | Fixed Price | | | |
| 0002 | Comprehensive Health Care Services | 12 | Month | | |
| 0003 | Comprehensive Health Care Services | 12 | Month | | |
| 0004 | Comprehensive Health Care Services | 12 | Month | | |

Total Amount of Contract $

**16. Table of Contents**

| (X) | Section | Description | Page | (X) | Section | Description | Page |
|---|---|---|---|---|---|---|---|
| | | **PART I – THE SCHEDULE** | | | | **PART II – CONTRACT CLAUSES** | |
| X | A | Contract Form | | X | I | Contract Clauses | 70 |
| X | B | Supplies or Services & Cost/Price | 1 | | | **PART III – LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACHMENTS** | |
| X | C | Services | 2 | X | J | List of Attachments | 77 |
| X | D | Packing and Marking | 3 | | | **PART IV – REPRESENTATIONS AND INSTRUCTIONS** | |
| X | E | Inspection and Acceptance | 33 | X | K | Representations, Certifications and Other Statements of Offerors | 78 |
| X | F | Contract Term | 34 | | L | Instructions, conditions & notices to offerors | N/A |
| X | G | Contract Administration data | 35 | | M | Evaluation factors for award | N/A |
| X | H | Special Contract Requirements | 38 | | | | |
| | | | 43 | | | | |

Contracting Officer will complete Item 17 or 18 as applicable

**17. ☒ CONTRACTOR'S NEGOTIATED AGREEMENT** (Contractor is required to sign this document and return __(2)__ copies to issuing office.) Contractor agrees to furnish and deliver all items, perform all the services set forth or otherwise identified above and on any continuation sheets, for the consideration stated herein. The rights and obligations of the parties to this Agreement shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, as amended, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.)

**18.** ☐ AWARD (Contractor is not required to sign this document.) Your offer on Solicitation Number _____ including the additions or changes made by which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

| 19A. Name and Title of Signer (Type or print) | 20A. Name of Contracting Officer |
|---|---|
| Vincent A. Keane, Chief Executive Officer | John Soderberg |

| 19B. | 19C. Date Signed | 20B. District of Columbia | 20C. Date Signed |
|---|---|---|---|
| _Vincent A. Keane_ (Signature of person authorized to sign) | 7/10/06 | _John Soderberg_ (Signature of Contracting Officer) | 7/19/06 |

EXHIBIT
B

tabbies

DC OCP 201 (7-99)

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

## SECTION B – SUPPLIES OR SERVICE AND PRICE

**B.1    SUMMARY OF SUPPLIES OR SERVICE**

The District of Columbia Office of Contracting and Procurement on behalf of the Department of Corrections (the District) seeks an experienced Contractor to provide Comprehensive Health Care Services at the District's Central Detention Facility (CDF), the Correctional Treatment Facility (CTF) and Community Correctional Centers (Halfway Houses).

**B.2    PRICE SCHEDULE – FIRM FIXED PRICE**

**B.2.1    BASE PERIOD (Date of award through September 30, 2006 for transition period, October 1, 2006 through September 30, 2009 for operational period)**

| CLIN | ITEM DESCRIPTION | UNIT PRICE | UNIT | QUANTITY | TOTAL ANNUAL PRICE |
|------|------------------|-----------|------|----------|--------------------|
| 0001 | Provide Comprehensive Health Care Services for the Department of Corrections Inmates population in accordance with Section C.3 (Base Year) | | | | |
| 0001AA | Transition Cost in accordance with Section C.3.32 | | | FIXED PRICE | |
| 0001AB | Provide Comprehensive Health Care Services for the Department of Corrections Inmates population in accordance with Section C.3 (Base Period Year 1) | $2,166,666.00 | Month | 12 | |
| 0001AC | Provide Comprehensive Health Care Services for the Department of Corrections Inmates population in accordance with Section C.3 (Base Period – Year 2) | $2,333,333.33 | Month | 12 | |
| 0001AD | Provide Comprehensive Health Care Services for the Department of Corrections Inmates population in accordance with Section C.3 (Base Period – Year 3) | $2,403,333.33 | Month | 12 | |
| **Total for Base Period** | | | | | |

**B.2.2    OPTION YEAR ONE**

| CLIN | ITEM DESCRIPTION | UNIT PRICE | UNIT | QUANTITY | TOTAL ANNUAL PRICE |
|------|------------------|-----------|------|----------|--------------------|
| 1001AA | Provide Comprehensive Health Care Services for the Department of Corrections Inmates population in accordance with Section C.3 (Option Year 1) | | Month | 12 | |
| **Total for Option Year One** | | | | | |

**B.2.3    OPTION YEAR TWO**

| CLIN | ITEM DESCRIPTION | UNIT PRICE | UNIT | QUANTITY | TOTAL ANNUAL PRICE |
|------|------------------|-----------|------|----------|--------------------|
| 2001AA | Provide Comprehensive Health Care Services for the Department of Corrections Inmates population in accordance with Section C.3 (Option Year 2) | | Month | 12 | |
| **Total for Option Year Two** | | | | | |

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

## SECTION C – DESCRIPTIONS/SPECIFICATIONS

**C.1    SCOPE**

The District of Columbia Office of Contracting and Procurement, on behalf of the Department of Corrections (the District), requires an experienced Contractor to provide Comprehensive Health Care Services for persons in the custody of the District and housed at the Central Detention Facility (CDF), the Correctional Treatment Facility (CTF) and Community Correctional Centers (Halfway Houses).

The primary purpose of the contract is to provide health care services which will include, but are not limited to: intake medical evaluation and screening, primary care, specialty care, diagnostic testing, surgical services, emergency and urgent care, inpatient care, rehabilitation/step down, dialysis, dental services, mental health services, substance abuse services and hospice.

Correctional health care provided shall be based on the five elements of the Public Health Care Model:

1. Early detection and assessment
2. Prompt and effective treatment at a community standard of care
3. Prevention measures
4. Comprehensive health education
5. Discharge Planning to encourage, continuity of care in the community upon release

**C.1.1    APPLICABLE DOCUMENTS**

The Contractor shall provide Comprehensive Health Care Services in accordance with the applicable documents listed below:

| Item No. | Document Type | Title | Date |
|---|---|---|---|
| 1 | Industry Standards | American Correctional Association (ACA) – Standards for Health Services http://www.aca.org/standards/healthcare/Standards.asp | 4th Edition |
| 2 | Industry Standards | National Commission on Correctional Health Care (NCCHC) Standards for Health Services In Jails http://www.ncchc.org/ | 2003 |
| 3 | Industry Standards | National Academy of Sciences – Food and Nutrition Board Dietary Reference Intakes-Applications in Dietary Planning http://www.nap.edu/books/0309085373/html/ | 2002 |
| 4 | District Licensing and Registration | Department of Health Licensing Administration - http://doh.dc.gov/doh/cwp/view,a,1371,q,600673,dohNav_GID,1879,dohNav,|34440|34445|.asp | 2005 |
| 5 | DOC Program Statement | Medical Management, 6000.1B | 3/9/04 |
| 6 | DOC Program Statement | Key Control, 5320.1A | 5/8/00 |

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

| Item No. | Document Type | Title | Date |
|---|---|---|---|
| 7 | DOC Program Statement | Tool Control, 5022.1B | 6/16/00 |
| 8 | DOC Program Statement | Suicide Prevention, 6080.2B | 9/15/03 |
| 9 | DOC Program Statement | Psychiatric Evaluation, 6014.6A | 8/25/87 |
| 10 | DOC Program Statement | Drug/Alcohol Testing (MEDAT) Mandatory Employee, 6050.4A | 2/1/00 |
| 11 | DOC Program Organizations | Record Retention, 2000.2 | 4/6/01 |
| 12 | DOC Program Statement | Health Information Privacy, HIPAA, 1300.3 | 12/15/03 |
| 13 | DOC Program Statement | Technical Reference Manual (Health Privacy Information Operations), 1300.3 | 12/15/03 |
| 14 | DOC Program Statement | "ADA: Communications for Deaf & Hearing Impaired," 3800.3 | 9/30/03 |
| 15 | DOC Program Statement | Environmental Safety and Sanitation, 2920.4 | 4/12/02 |
| 16 | DOC Program Statement | Accountability for Inmates, 5010.2B | 7/1/04 |
| 17 | DOC Program Statement | Contraband Control, 5010.3B | 10/31/03 |
| 18 | DOC Policy | Information Security, 2420.2 | 12/15/03 |

## C.1.2       DEFINITIONS/ACRONYMS

C.1.2.1     "ACA" shall mean the American Correctional Association.

C.1.2.2     "AMA" shall mean the American Medical Association.

C.1.2.3     "Business Day" shall mean any day on which offices of the government of the District of Columbia are open for business.

C.1.2.4     "CCA" shall mean the Corrections Corporation of America.

C.1.2.5     "CDF" shall mean the Central Detention Facility.

C.1.2.6     "Comprehensive Health Care Services" shall refer to medically necessary health services required by Inmates delivered both inside and outside CDF, CTF and CCCs including primary and specialty physician and other health professional services, hospital services (inpatient and outpatient), nursing or other step-down care, hospice, pharmaceutical dispensing, laboratory and diagnostics, and other ancillary services.

C.1.2.7     "CTF" shall mean the Correctional Treatment Facility.

C.1.2.8     "DOC" shall mean the District of Columbia Department of Corrections.

C.1.2.9     "FTE" shall mean Full Time Equivalent personnel, stated in terms of individuals working a regularly scheduled 40-hour week, or 2,080 hours worked per annum.

C.1.2.10    "JCAHO" shall mean the Joint Commission on Accreditation of Healthcare Organizations.

C.1.2.11    "NCCHC" shall mean the National Commission on Correctional Health Care.

C.1.2.12    "PPD" shall mean the Purified Protein Derivative/Mantoux skin test used to screen for tuberculosis.

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

**C.1.2.13**  "R&D" shall mean the Receiving and Discharge area or the Receiving and Discharge process for the Central Detention Facility.

**C.1.2.14**  "Sick Call" shall mean non-emergency care rendered to Inmates.

**C.2**  ## BACKGROUND

The District of Columbia Department of Corrections (DOC) is responsible for managing the detention of pre-sentenced and sentenced male, female, and juvenile offenders in the District of Columbia. This population shall hereafter be referred to as "Inmates." The DOC manages two facilities, the Central Detention Facility (CDF) and the Correctional Treatment Facility (CTF), to house this population, in addition to contracting for community correctional center beds and a secure ward at the Greater Southeast Community Hospital (GSCH Locked Ward). The official capacities of the CDF and CTF are currently 2,498 and 1,206 respectively. The Inmate population at the CDF and the CTF is highly transient and exhibits a wide array of serious health problems, including tuberculosis, HIV/AIDS, sexually transmitted disease, and mental illness.

The Correctional Treatment Facility is currently operated by Correctional Corporation of America on behalf of the Department of Corrections.

A summary of the services currently offered by the incumbent are shown below.

| Facility/Address | Service Summary Description | Population |
|---|---|---|
| Central Detention Facility (DC Jail) 1901 D Street, S.E. Washington, DC 20003<br><br>Correctional Treatment Facility 1901 E Street, S.E. Washington, D.C. 20003 | ▪ On-site Comprehensive Medical and Mental Health Services | All populations assigned to the CDF and CTF. The average population for period January 2005 – December 2005 was 3,499. |
| Pre-Release Community Correctional Centers (Contract Beds) See C.3.16.1 | ▪ Provision of Nurse Practitioner to provide evaluation and coordination for Medical and Mental Health Services. ▪ Management of the medication continuum ▪ Provision of pharmaceuticals | Contracted facilities only. 126 beds |
| Greater Southeast Community Hospital (GSCH) Locked Ward 1310 Southern Avenue S.E. Washington, DC 20032 | ▪ Utilization Review and oversight of all GSCH admissions to the Locked Ward (Excludes in-patient costs) and all other medical outposts. | Inpatient populations of GSCH Locked Ward, who are referred by: ▪ Central Detention Facility ▪ Correctional Treatment Facility ▪ Court ordered assignment |

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

## C.3    REQUIREMENTS

a) The Contractor shall provide Comprehensive Health Care Services in accordance with legal requirements imposed by Federal and District of Columbia laws, District Licensing or Professional Boards, Court Orders, and DOC Administrative Directives/Policy Statements, including compliance with aspects of the Health Insurance Portability and Accountability Act of 1996.

b) The Contractor's duties and obligations regarding the provision of Comprehensive Health Care Services hereunder shall be subject to Contractor's ability to perform such duties and obligations at the CTF and CDF. To the extent that the Contractor is prevented from performing its duties and obligations under this contract because it does not have necessary, timely access to Inmates, whether because of security reasons or the District's failure to provide appropriate facilities and/or equipment, the Contractor shall be relieved from any associated duties and obligations provided for hereunder.

c) The Contractor shall begin transition activities no later than ten (10) days after contract award. The Contractor shall submit to the COTR a transition plan, including milestones, in accordance with section C.3.32, within sixty (60) days of contract award. During the transition period, the Contractor shall become familiar with all aspects of the medical units and services provided in the CDF, CTF, and Community Correctional Centers (Halfway Houses). The Contractor shall provide an Operations Manual that includes procedures, protocols, and methodologies for treatment; description of treatment programs; performance measures and reporting; final staffing plan, including job descriptions; training plan; and quality management program to the COTR for approval within thirty (30) days of contract award.

d) The Contractor shall provide the Comprehensive Health Care Services described herein.

## C.3.1    CONTRACTOR EXPERIENCE AND ACCREDITATION

C.3.1.1    The Contractor shall provide a Principal Leadership staff, all of whom have had significant experience in administering or providing Comprehensive Health Care Services for correctional and/or community health care programs. Principal Leadership staff shall include the Medical Director, Mental Health Director, Health Care Administrator and Director of Nursing.

C.3.1.2    The Contractor shall provide Comprehensive Health Care Services in accordance with the standards of the American Medical Association (AMA), applicable American Correctional Association (ACA) Health Care Standards, the Health Resources and Services Administration (HRSA) of the United States Department of Health and Human Services (DHHS), and other relevant standards defined in the policy and procedures of DOC.

C.3.1.3    The Contractor shall cooperate with the District to maintain ACA health care accreditation at CTF. Contractor shall cooperate with the District to

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

obtain health care accreditation by the American Correctional Association (ACA) for the CDF during the term of the contract. The Contractor shall be subject to the provisions of the Defaults clause in the Standard Contract Provisions (Attachment J.2) for failure to maintain ACA health care accreditation. The Contractor shall cooperate with the District to maintain NCCHC health care accreditation at CDF and CTF.

C.3.1.4    The Contractor must be a Federally Qualified Health Center (FQHC) and submit proof that the CDF and the CTF have been listed on Exhibit B of Contractor's federal grant and therefore that they are eligible sites for Federal Tort Claims Act coverage. The Contractor shall submit a copy of FQHC with CDF and CTF listed in Exhibit B to the COTR within 30 days of contract award.

C.3.1.5    The Contractor shall be a District based community health care provider with demonstrated experience caring for low income, uninsured, and underinsured patients. The Contractor shall operate community-based health centers that are geographically, culturally, and linguistically accessible to all major ethnic groups and high-risk populations across the District.

C.3.1.6    The Contractor shall have the capacity to provide Comprehensive Health Care Services, as outlined in this Scope of Work, to District Inmates either directly or through medical sub-contractors. If some Comprehensive Health Care Services are provided through sub-contract, the Contractor must be capable of developing and managing a provider network and processing claims.

## C.3.2    INTAKE HEALTH SERVICES

The Contractor shall conduct a health assessment and provide intake health services for all incoming Inmates at CDF.   The intake services shall be performed by licensed health care personnel within 24 hours of notification of arrival at the CDF, unless otherwise medically necessary.

### C.3.2.1    ASSESSMENT

C.3.2.1.1    The Contractor shall conduct a health assessment of all Inmates arriving at CDF in accordance with the ACA and National Commission on Correctional Health Care (NCCHC) standards and the following program statements: Medical Management, 6000.1B, Key Control 5320.1A and Tool Control, 5022.1B.

C.3.2.1.2    The Contractor shall conduct an abridged health assessment for all Inmates transferring between facilities within 24 hours of notice of arrival to include but not be limited to, medical record review, medication evaluation and necessary intervention. The Contractor shall document the abridged health assessment in the medical record.

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

## C.3.2.2  HEALTH CARE INTAKE

The Contractor shall provide or arrange for the provision of the following health care intake services except as may otherwise be set forth below:

C.3.2.2.1  Review of demographic information, triage data and noting of any psychiatric and/or medical alerts.

C.3.2.2.2  Complete set of vital signs, including measured weight.

C.3.2.2.3  A finger sticks blood sugar for all known diabetics and peak expiratory flow rate for all known patients with a history of asthma or emphysema.

C.3.2.2.4  A medical history, health assessment including oral examination, review of systems and substance abuse history performed by a licensed physician, licensed and certified physician assistant, licensed nurse practitioner or registered nurse.

C.3.2.2.5  A complete gynecological exam for female Inmates within 14 days of intake, including a Papanicolaou smear, for Inmates who evidence specific problems, or a history suggestive of a need, unless refused.

C.3.2.2.6  Urine pregnancy test for all female Inmates.

C.3.2.2.7  A syphilis serology for all Inmates.  Any Inmates reentering the facility from the community shall have these tests regardless of the date of last such exam. Additional laboratory tests shall be performed as directed by the examining physician.

C.3.2.2.8  Urine based testing of gonorrhea and Chlamydia on all intakes.

C.3.2.2.9  HIV counseling and testing will be provided by the District. The Contractor cooperates with the District to ensure that all Inmates receive such testing.

C.3.2.2.10  The Mantoux TB skin test shall be applied unless the Inmate has received a TB skin test at a DOC facility within six months prior to the current intake or has history of a positive skin test in the past.

C.3.2.2.11  A posterior-anterior chest x-ray using teleradiology to screen for all males, and females after evidence of a negative pregnancy test. All x-ray shall be performed in accordance with the Centers for Disease Control (CDC) Guidelines for Control and Management for TB in Correctional Facilities.

C.3.2.2.12  Medical personnel review of chest x-ray within 24 hours, laboratory and tuberculosis skin test results within 72 hours of intake. Medical personnel shall review laboratory results

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

within 72 hours of receipt. Appropriate referrals for follow-up or further evaluation if required shall be made within 24 hours of the review.

**C.3.2.2.13** Urgent care, as assessed, provided immediately with a referral to the physician, physician assistant or nurse practitioner for follow-up as medically indicated.

**C.3.2.2.14** First dose medications shall be administered as prescribed by the examining health care provider before leaving the medical unit.

**C.3.2.2.15** Other tests and examinations as required and/or medically indicated.

**C.3.2.2.16** Perform medical clearances screening for all intakes for consideration of placement in off unit or in unit work detail squads.

**C.3.2.2.17** Provide information describing the process and procedure for accessing internal and external health care.

**C.3.2.3  MENTAL HEALTH INTAKE**

**C.3.2.3.1** The Contractor shall conduct an initial mental health screening for all intakes regardless of their projected length of incarceration. The initial screening shall include, but shall not be limited to, the following factors:

**C.3.2.3.1.1** Past or current mental health treatment.

**C.3.2.3.1.2** Major problems other than legal situation.

**C.3.2.3.1.3** Prior suicide attempts.

**C.3.2.3.1.4** Suicide by a family member or close associate.

**C.3.2.3.1.5** A position of prominence in the community.

**C.3.2.3.1.6** An absence of a support network.

**C.3.2.3.1.7** First incarceration.

**C.3.2.3.1.8** A recent major loss.

**C.3.2.3.1.9** A current suicidal ideation.

**C.3.2.3.1.10** Court ordered forensic evaluation.

**C.3.2.3.1.11** Return from John Howard Pavilion or other inpatient psychiatric facility.

**C.3.2.3.1.12** History of violent behavior.

**C.3.2.3.1.13** History of drug or alcohol use.

**C.3.2.3.1.14** Intellectual functioning.

**C.3.2.3.1.15** History of victimization.

**C.3.2.3.2** The Contractor shall conduct a comprehensive mental health evaluation for Inmates who present with one or more of the items identified in the initial screening in the event that Contractor, in its professional medical judgment, determines that such screening is medically necessary. The comprehensive mental health evaluation shall include additional questioning and testing in order to determine a diagnosis and appropriate treatment.

## C.3.3 DAILY TRIAGING OF COMPLAINTS

The Contractor shall collect and triage all health complaints from Inmates daily. All triage activities shall be under the direction of a registered nurse. The Contractor shall see all non-lock-down Inmates requesting assessment within one Business Day of the receipt of request. The Contractor shall conduct daily triage in the Lock Down Units 7 days a week. The Contractor shall collect requests in accordance with ACA and NCCHC standards and DOC procedures.

## C.3.4 SICK CALL SERVICES

**C.3.4.1** The Contractor shall provide sick call services for Inmates requesting routine or non-emergency medical care within one Business Day. The Contractor shall see all Inmates in lock-down requesting a Sick Call within 24 hours of the request. Sick call services shall be provided Monday through Friday (excluding holidays) by a register nurse for all housing units except those considered "Lock-Down Units". The Contractor shall provide sick call services for "Lock-Down Units" seven (7) days per week, including District holidays.

**C.3.4.2** The Contractor shall provide a nurse to initially evaluate presenting Inmates in accordance with the Contractor's sick call protocols and shall either treat the Inmate or make a referral to the physician. The Contractor shall include its sick call protocols in its Operations Manual.

## C.3.5 PRIMARY, ACUTE, AND CHRONIC CARE SERVICES

**C.3.5.1** The Contractor shall provide Inmates, with chronic illnesses, continuous and appropriate health care services to prevent or reduce complications of chronic illnesses and promote health maintenance. Primary, acute, and chronic care services shall be provided by a physician or physician assistant or nurse practitioner (under the direction of a physician). The Contractor shall refer any Inmates with evidence of a chronic illness in to a Primary Care Health Service.

**C.3.5.2** The Contractor shall provide chronic care clinics and sick call services concurrently. Chronic Care services shall be provided Monday through

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

Friday (excluding holidays) for all housing units including "Lock-Down Units."

**C.3.5.3** The Contractor shall develop a treatment plan for all Inmates diagnosed with a chronic condition. Upon notice of discharge to the Contractor, this treatment plan shall be incorporated into a discharge plan and transferred to a Contractor community health center or affiliated community health center upon Inmate's release into the community for follow-up and continuity of care.

## C.3.6 SPECIALTY SERVICES

**C.3.6.1** The Contractor shall provide the management and referral of medically necessary specialty services (i.e., specialty consultations/clinics, and all diagnostic services and procedures). The Contractor shall conduct "Specialty Services" either on-site, off-site, or via telemedicine equipment as indicated. "Specialty Services" shall be defined as those services provided for patients with needs beyond routine care, which are provided by a licensed practitioner with specialized knowledge and experience. These Specialty Services involve evaluation and treatment. Among the Specialty Services that shall be provided under this contract are: Cardiology, Ophthalmology, Dermatology, Gynecology, Orthopedics, Neurology, Podiatry, and Infectious Disease.

**C.3.6.2** The Contractor shall provide or arrange for the provision of Specialty Services for Inmates referred by the examining practitioner at its own cost.

**C.3.6.3** The Contractor shall use its reasonable efforts to provide such Specialty Services within thirty (30) days of the referral by the examining practitioner. The thirty day threshold shall not relieve the Contractor of responsibility to appropriately manage and refer Inmates presenting with acute or urgent conditions, in accordance with clinical indications and accepted medical practices.

**C.3.6.4** The Contractor shall not be responsible for the cost of any Specialty Services provided to any Federal Inmates who are housed at CDF or CTF or the CCC's through an arrangement with the Federal Bureau of Prisons or the U.S. Marshall Service. DOC will identify all such Inmates that qualify for federal billing and inform the Contractor of the same.

**C.3.6.5** Except as otherwise provided in Section C.3.9 of this Contract, the District will bear the full cost of transporting any Inmates to an off-site location for specialty services.

## C.3.7 HOSPITAL SERVICES

**C.3.7.1** The Contractor shall provide a referral to subcontract hospital (s) for Inmates who require care exceeding the resources available at the CTF or CDF. The Contractor shall make timely referrals based upon the

severity of the problem. The Contractor shall ensure that a physician prior to transfer of an Inmate approves all referrals.

C.3.7.2    The Contractor shall provide inpatient and outpatient hospital services via subcontract, preferably at a hospital with a dedicated secure unit (Locked Ward). The subcontract hospital (s) shall be licensed and fully accredited by the Joint Commission on Accreditation of Healthcare Organizations (JCAHO) and in compliance with applicable District and Federal laws and regulations.

C.3.7.3    The Contractor shall be responsible for all hospital costs including hospital outpatient and inpatient negotiated costs per stay and ambulatory care costs.

C.3.7.4    The Contractor shall hire a licensed Practitioner with experience in the correctional and/or community setting as the primary on-site liaison and coordinator of care between the internal and external care providers at the hospital. In the event that the Practitioner in unable to practice on-site at a subcontracted hospital, the Contractor shall make arrangements for a member of the subcontracted hospital's staff to serve as the primary liaison and coordinator of care between the subcontracted hospital and the District.

C.3.7.5    The Contractor shall enter a progress note in the Inmate's medical record within 12 hours of any off-site service except during weekends and holidays. In instances where the Contractor is unable to obtain the report or discharge summary within the required 12 hours, the Contractor shall notify the DOC Medical Director who will assist with obtaining said report or summary. The Contractor shall obtain a report or discharge summary for patients returning from an off-site facility, which at a minimum contains:

(a)  Reason for the consultation (Subjective)
(b)  Appropriate exam/lab findings (Objective)
(c)  Diagnosis (Assessment)
(d)  Evaluation (Plan)
(e)  Follow-up requirements or appointment if necessary

C.3.7.6    Except as otherwise provided in Section C.3.9 of this Contract, the District will bear the full cost of transporting any Inmates to an off-site location for hospital services.

C.3.7.7    The Contractor shall not be responsible for the cost of any hospital services provided to any Federal Inmates who are housed at CDF or CTF or the CCCs, not withstanding anything contained herein to the contrary. DOC will identify all such Inmates that qualify for federal billing and inform the Contractor of the same.

## C.3.8    UTILIZATION MANAGEMENT

C.3.8.1    The Contractor shall review the health care status of Inmates referred off-site for in-patient and out-patient care to ensure that number of such

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

referrals and the duration of care is medically appropriate. The Contractor shall station a licensed Practitioner on-site at the subcontracted hospital (s) to oversee, direct, manage, track, and document inpatient/outpatient activity within the community-oriented health care network. The Contractor shall submit a monthly report to the COTR on off-site care that details the number of referrals, date of care, duration of care, appropriateness of care, payment rates and diagnostic category of care.

C.3.8.2    The Contractor shall perform monthly and quarterly quality performance and improvement reviews/audits utilizing the Performance Metrics and Measurement Tools developed by DOC.

C.3.8.3    The Contractor and DOC shall meet at least once every three months to review issues surrounding Comprehensive Health Care Services, including utilization, projections, and other components to coordinate the care. The Contractor and DOC may elect to have representatives from subcontract hospital(s) present at these meetings.  Issues to be addressed at the quarterly meetings include the following:

    i.     Utilization of Comprehensive Health Care Services;
    ii.    Access to Comprehensive Health Care Services;
    iii.   Quality of Comprehensive Health Care Services;
    iv.   Formulating and/or revising appropriate projection plans for Comprehensive Health Care Services;
    v.    Review the appropriateness of current funding and future funding;
    vi.   Review utilization of high-cost services, average length of stays, and one-day admissions; and,
    vii.  Any other issues raised by the Contractor or DOC.

## C.3.9   EMERGENCY SERVICES

C.3.9.1    The Contractor shall provide emergency services in an area located in the medical unit of the CDF and CTF.  The Contractor shall be responsible for providing emergency medical assessment and stabilization services, including first-aid and cardiopulmonary resuscitation, and arranging ambulance services for Inmates, DOC staff, contractors, and visitors, 24 hours per day, seven days a week. Transportation cost for these populations shall not be the responsibility of the Contractor.

C.3.9.2    The Contractor shall contact emergency medical personnel for emergency hospital transfers to transport patients to outside hospital facilities for emergency services that cannot be adequately treated in the Urgent Care Center within the Medical Clinic, Sick Call or Chronic Care Clinics.

C.3.9.2.1    The District of Columbia Fire and Emergency Medical Services (EMS) will provide emergency transport services.

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

The Contractor shall notify the appropriate correctional staff that an escort is necessary when EMS personnel are brought into the facility.

C.3.9.2.2    The Contractor shall be financially responsible for all 911 emergency ambulance costs for the Inmate population.

C.3.9.2.3    The Contractor shall be financially responsible for all intra-hospital ambulance transfers from the Inmate population.

## C.3.10 INFIRMARY/SHORT STAY CARE

C.3.10.1 The Contractor shall operate the infirmary at CTF. Infirmary care shall be available for Inmates requiring nursing care, chronic illness care, convalescent care, and all acute and chronic conditions which can be managed on-site. At a minimum the operation of the infirmary shall include:

C.3.10.1.1    A physician, physician assistant or nurse practitioner shall be on duty 24 hours a day. A progress note shall be entered in the chart at least every 24 hours for all patients admitted.

C.3.10.1.2    Daily on-site supervision of the infirmary by a registered nurse. If intravenous medications are being administered, a licensed nurse must be physically present in the infirmary at all times.

C.3.10.1.3    Nursing staff on duty within sight and sound of Inmate-patients 24 hours a day.

C.3.10.1.4    A manual of nursing care procedures for infirmary care. The Contractor shall provide a copy of the manual within thirty (30) days to COTR after contract award.

C.3.10.1.5    A complete inpatient record for each patient admitted to the infirmary, including an admission work-up and discharge planning.

C.3.10.2 The Contractor shall utilize the medical and mental health infirmaries to the fullest capacity to reduce off-site hospitalization when medically feasible.

## C.3.11 DENTAL SERVICES

C.3.11.1 The Contractor shall provide routine and emergency dental services to Inmates consistent with local and Federal guidelines and community standards. The Contractor shall ensure that the dentist and qualified staff be available for the treatment of dental emergencies, and respond within twenty-four (24) hours of notification of emergency. Treatment based upon assessed needs shall include, but not be limited to, the following services:

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

      **C.3.11.1.1**   Prophylactic, Oral Hygiene

      **C.3.11.1.2**   Periodontal screening, evaluation and limited early treatment

      **C.3.11.1.3**   Routine and simple surgical extractions and tooth restoration with fillings

      **C.3.11.1.4**   Prosthetics

      **C.3.11.1.5**   Patient Education with nutritional/dietary counseling

   **C.3.11.2** The Contractor shall provide:  a) all staffing, instrumentation and supplies, including prosthetic cost; and b) maintenance or replacement of equipment.  The Contractor shall provide a copy of equipment maintenance or supply agreements to the COTR for review upon request.

      **C.3.11.2.1**   The Contractor shall provide monthly radiology testing for detection of dental staff exposure to radiation.

## C.3.12 MENTAL HEALTH SERVICES

   **C.3.12.1** The Contractor shall provide mental health services to Inmates including, but not limited to:

      **C.3.12.1.1**   Mental health assessments, lab and diagnostic testing

      **C.3.12.1.2**   Control, dispensation, and administration of all psychotropic and mental health medication

      **C.3.12.1.3**   Monitoring of medication to ensure Inmate compliance and evaluate effectiveness in alleviation of symptoms

      **C.3.12.1.4**   Supplying all mental health staffing, including mental health specialists

      **C.3.12.1.5**   Suicide prevention intervention and treatment for psychiatric emergencies

      **C.3.12.1.6**   Treatment of Inmates with the most severe forms of mental illness

      **C.3.12.1.7**   Basic services for the general population as described in DOC policies, specifically 6014.6A Psychiatric Evaluation and Hospitalization of Department Residents; and 6080.2B Suicide Prevention.

      **C.3.12.1.8**   Close collaboration with the Department of Mental Health to ensure continuity of care/discharge planning.

   **C.3.12.2** The Contractor shall conduct an initial mental health screening of all Inmates entering the CDF as described in C.3.2.3.1.

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

**C.3.12.3** The Contractor shall conduct a comprehensive mental health evaluation as required in accordance with C.3.2.3.2.

**C.3.12.4** The Contractor shall provide all aspects of in-patient and out-patient On-Site mental health care.

**C.3.12.5** The Contractor shall be responsible for treatment and staffing of the mental health special units and safe cells in the CDF. These special bed resources are provided for Inmates requiring a higher level of care for serious and persistent mental illnesses, arrestees at high risk for suicide and individuals who are clinically depressed.

**C.3.12.6** The Contractor shall develop a program plan for mental health, including staffing deployment and call coverage. The mental health program plan shall include provisions for:

**C.3.12.6.1**   Treatment and Staffing of Special Units and Beds:

(1) Mental Health
(2) Two (2) Safe-Cells for Observation

**C.3.12.6.2**   Management, Arrangement and Coordination of Outside Admissions

**C.3.12.6.3**   Required Mental Health Programs:

(1) Open Population/Outpatient Management / Clinics
(2) Mental Health Sick Call
(3) Management of High Acute Observations
(4) Use of Restraints
(5) Behavior Management and Individual Treatment Plans
(6) Management of Consultations (Routine and Emergency)
(7) Individual Counseling and Psychotherapy
(8) Discharge Planning
(9) Psychotropic Medication Management/Clinics

**C.3.12.6.4**   Multidisciplinary approaches to promote integration between Mental Health and Medical treatment.

## C.3.13 SUBSTANCE ABUSE

**C.3.13.1** The Contractor shall develop and provide a medical detoxification policy for drug and alcohol addicted Inmates. The Contractor shall include the description of the medical detoxification policy in its Operations Manual.

**C.3.13.2** The Contractor shall coordinate its program with local and regional alcohol and drug treatment programs identified by the COTR. The Contractor's program shall include provisions for substance abuse education, either in-house or off-site with a narrative description of program structure and specifications for staffing.

DCFL-2006-D-6001
Community Oriented Correctional Health Care for Department of Corrections

## C.3.14 ANCILLARY SERVICES

The Contractor shall either through itself or subcontracts to provide radiology, laboratory, pharmacy, durable medical equipment, and other ancillary services and supplies, except as detailed below.

## C.3.15 PHARMACY SERVICES

The Contractor shall provide Pharmacy Services, including but not limited to pharmaceutical operations with licensed pharmaceutical staff, inventory control, dispensing, distribution and disposal of all pharmaceuticals. The pharmacy shall be on site at the CDF.

C.3.15.1 The Contractor, upon DOC's notification of Inmate's release, shall follow the following protocols for Inmates on medication: Inmates sent to the Federal Bureau of Prisons shall receive a seven (7) day supply of medications, upon transfer. All Inmates sent to the Community Correctional Centers (CCC) shall receive a seven (7) day supply of medications upon transfer. All Inmates released to the community shall receive a seven (7) day supply of medications upon release.

C.3.15.2 All pharmaceuticals will be procured by the Department of Corrections with the exception of those covered by the Department of Health under the AIDS Drug Assistance Program (ADAP). The Contractor shall utilize a formulary approved by the DOC. Dispensing of pharmaceuticals shall be in accordance with District of Columbia and Federal laws, and pharmacy regulatory boards. The Contractor shall utilize an automated pharmacy system for dispensing pharmaceuticals in collaboration with DOC.

C.3.15.3 All prescription medications shall be prescribed by the responsible practitioner compounded and dispensed by a licensed pharmacist and shall be delivered to the Inmates in conformance with District law. The Pharmacy on-site shall be licensed to provide all pharmacy services for medication distribution at DOC. The Contractor shall provide on-call coverage by a licensed pharmacist 24 hours/day, 7 days/week for emergency and stat needs.

C.3.15.4 The Contractor shall develop and maintain a quality management program including management controls, staffing plan, and expected quality improvement indicators. The Contractor shall include its quality management program in its Operations Manual.

C.3.15.5 A DOC licensed pharmacist will provide oversight, internal controls, audit procedures and overall accountability to receive, segregate, distribute, secure, account for and monitor use of the pharmaceuticals at the DOC service sites.

C.3.15.6 The Contractor shall provide all forms necessary for ordering controlled drugs, and maintaining prescription logs, inventory, medication administration records, patient profiles, and prescriptions. The Contractor shall maintain appropriate documentation including, but not



**DISTRICT OF COLUMBIA**
**DEPARTMENT OF CORRECTIONS**

# Program
# Statement

**OPI:**      DIR
**Number:**   4030.1E
**Date:**     July 1, 2004
**Subject:**  Inmate Grievance Procedures
              (IGP)

1.  **PURPOSE AND SCOPE.** To update administrative procedures through which inmates of the District of Columbia Department of Corrections (DOC) may seek formal redress of their grievances.

2.  **POLICY.** It is DOC policy to provide an administrative means for expression and resolution of inmate problems through written complaints, responses and appeal.

3.  **APPLICABILITY**

    a.  This Program Statement (PS) applies to persons housed in correctional facilities operated under the authority of the DOC.

    b.  Inmates housed in contract prison facilities shall use the contractor's grievance process, noting the contractor to be responsible for day-to-day operations within the affected facility. Inmates housed in contract prison facilities shall only file a grievance with the DOC when grievance appeal steps within the contractor's grievance process have been exhausted.

4.  **NOTICE OF NON-DISCRIMINATION**

    a.  In accordance with the D.C. Human Rights Act of 1977, as amended, D.C. Code section 2.1401.01 et seq., ("the Act") the District of Columbia does not discriminate on the basis of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, familial status, family responsibilities, matriculation, political affiliation, disability, source of income, or place of residence or business. Discrimination in violation of the Act will not be tolerated. Violators will be subject to disciplinary action.

    b.  DOC prohibits discrimination regarding administrative decisions or program access for inmates.

5.  **PROGRAM OBJECTIVES.** The expected results of this program are:

    a.  Staff is available to counsel inmates on request.



EXHIBIT
C

    b.    Inmate grievances will be resolved through formal procedures when informal means have failed.

    c.    Written responses based upon full investigation and resolution when appropriate including the reasons for the decision shall be given to all inmate grievances within the prescribed time limits.

    d.    Inmates will use this procedure and pursue claims in court only if dissatisfied with resolutions obtained from the IGP.

## 6.   DIRECTIVES AFFECTED

### a.   Directive Rescinded

    D.O. 4030.1D   Inmate Grievance Procedure (IGP) (5/4/92)

### b.   Directives Referenced

| | | |
|---|---|---|
| 1) | PS 2000.2 | Retention and Disposal of Department Records (4/6/01) |
| 2) | DO 3350.2C | Sexual Misconduct Against Inmates (12/10/98) |
| 3) | PS 3800.3 | Communications for Deaf and Hearing Impaired (9/30/03) |
| 4) | PS 4020.1B | Orientation Program (7/1/04) |
| 5) | PS 4022.1A | Community Correctional Centers Disciplinary Procedures (8/13/02) |
| 6) | SO 5300.1C | Adjustment Board Procedures Detention Services (8/1/04) |
| 7) | PS 4020.1A | Admission and Orientation Program (9/21/00) |
| 8) | PS 4090. 2 | Intake Screening (7/1/04) |
| 9) | CA 93-2052 | Women Prisoners of DCDC v. DC (6/17/97) |

## 7.   AUTHORITY.  DC Code §24-211.02 Powers: Promulgation of Rules

## 8.   STANDARDS REFERENCED

American Correctional Association (ACA) 4th Edition Standards for Adult Local Detention Facilities 4-ALDF-2A-27, 4-ALDF-6B-01 and 4-ALDF-6B-02.

9. **DEFINITIONS.** For the purpose of this Program Statement (PS), the following definitions apply:

    a.    **Grievance** – An administrative means for the expression and resolution of inmate/offender problems.

    b.    **Non-Grievance Issues.** In accordance with this directive the following issues cannot be grieved under this process:

        1)    Parole Commission decisions,
        2)    Decisions of the Adjustment or Housing Boards
        3)    Classification Committee decisions,
        4)    Requests under Freedom of Information Act,
        5)    Inmate Accident Claims, Tort Claims, and
        6)    Complaints filed on behalf of other inmates.
        7)    Inmate class action grievances or petitions

    c.    **Reprisal** – Any overt or covert action or threat of action against an inmate/offender for the good faith use of, or participation in, the inmate grievance process.

    d.    **Correctional Facilities** - Any DOC institution, either contracted or owned by the DOC that houses adult inmates/offenders in a halfway house or jail.

10. **RESPONSIBILITIES**

    a.    This directive shall be implemented under the authority of the DOC Director.

    b.    Wardens and the Community Residential Programs (CRP) Administrator shall ensure that an appropriate investigation is conducted and an adequate response is prepared for each grievance in accordance with the procedures set forth in this directive.

    c.    Each facility shall maintain a sufficient supply of Inmate Request Slips for use in addressing informal complaints.

    d.    Each facility shall maintain a sufficient supply of IGP forms for formal resolution.

    e.    Each Housing Unit and Community Correctional Center (CCC) shall ensure that sufficient forms are available and accessible on the unit during his or her tour of duty.

    f.    The IGP shall be available to inmates regardless of any disciplinary, classification, or other administrative or legal conditions affecting them.

g.  Employees shall not retaliate or allow other inmates to retaliate against an inmate/offender for participation in the Inmate Grievance Procedure.

11.  **INMATE/OFFENDER NOTIFICATION**

a.  The Warden or the Community Residential Programs (CRP) Administrator shall ensure that this PS and any other written directives pertaining to the Inmate Grievance Procedure (IGP) are readily available to all inmates housed in DOC correctional facilities.

b.  An orientation of the inmate/offender grievance procedure shall also be provided to each inmate/offender upon arrival at a correctional facility.  During orientation each inmate/offender shall be given the opportunity to ask questions concerning the IGP and given an opportunity to have these questions answered orally.

c.  This PS shall be made readily available in the law library and case manager offices, posted on inmate/offender bulletin boards and, as appropriate, shall be described in inmate/offender handbooks.

d.  Female inmates/offenders shall be advised of the provisions of CA 93-2052 Women Prisoners v. DC and DO 3350.2C Sexual Misconduct Against Inmates (12/10/98), allowing them to through the inmate grievance form or notice to an employee or inmate representative on the Inmate Grievance Advisory Committee (IGAC) to report verbally or in writing instances of sexual harassment.

e.  The Warden shall ensure that non-English speaking inmates, inmates who cannot read or are otherwise impaired (physically or mentally), receive assistance in order to understand and access the IGP.

12.  **STAFF NOTIFICATION/TRAINING**

a.  The Deputy Director for Operations and CRP Administrator shall ensure that this PS and any other written directives pertaining to the IGP shall be made available to all staff assigned to correctional institutions.

b.  The Department's Training Academy shall include a discussion of the IGP PS as part of its Pre-service and In-service training curriculum for employees.

c.  Staff members shall have an opportunity to ask questions regarding the IGP and will be given an opportunity to have these questions answered orally.

d.  The Training Administrator shall maintain the signed acknowledgements on file.

13. **INMATE GRIEVANCE PROCEDURE (IGP) COORDINATOR**

   a.   The Warden and the CRP Administrator shall appoint an IGP Coordinator who shall:

   1)   Coordinate activities and operations associated with IGP retrieval, distribution, tracking, database entry, monitoring and establishment of resolution suspense dates.

   2)   The CDF IGP Coordinator or designee shall collect grievances from each housing unit 'IGP" mailbox on a daily basis (excluding Saturdays, Sundays and legal holidays).

   3)   Maintain the JACCS electronic data input and tracking.

   4)   Apprise the affected Warden or CRP Administrator on the next business day when suspense dates are not met.

   5)   If the inmate/offender is transferred to another facility under the jurisdiction of or contract with DOC, the IGP Coordinator shall forward the response to the IGP Coordinator at the affected facility.

   6)   The IGP Coordinator where the inmate is located shall ensure that the response is forwarded to the inmate/offender and a copy placed in the inmate's official institutional record.

   b.   The Director and Deputy Director shall assign staff to perform the above stated duties at the respective appeal levels.

14. **GRIEVANCE PROCESS**

   a.   **Informal Resolution**

   1)   Executive staff, Chief Case Managers, Case Managers, Correctional Supervisors, Correctional Counselors and Housing Unit Officers shall make every attempt to keep the channels of communication open between staff and inmates/ offenders and shall informally resolve issues expeditiously whenever possible.

   2)   Whenever an inmate/offender has a dispute or complaint, the inmate/offender should, whenever appropriate and possible, first seek to resolve this situation informally by completing an Inmate Request Slip or verbally notifying and discussing the complaint with the relevant parties or an appropriate DOC employee or manager.

3)    Inmate Request Slips, for the purpose of informal resolution, shall be placed in the institutional or CCC mailbox and not in the IGP mailbox.

4)    The staff person receiving the initial complaint shall discuss and document his or her efforts to informally resolve the complaint at this level within 7 calendar days.

b.   **Formal Resolution**

1)    Whenever an inmate/offender has not been able to resolve a complaint through informal means, he or she may file a formal grievance by completing an IGP Form 1 (Attachment A).

2)    DOC also strictly prohibits reprisals against inmates/offenders for the good faith filing of grievances or legal actions. Inmates who believe they have been subjected to reprisals for using the IGP may submit a subsequent grievance seeking a remedy.

3)    The inmate/offender must attach documentation of efforts to reach informal resolution. Each grievance must pertain to one specific incident, charge or complaint.

4)    Inmates/offenders shall not submit duplicate copies of the same grievance.

5)    Inmates may request IGP Forms from any staff member who is assigned to his or her housing unit and the affected staff member shall ensure that inmates who request an IGP Form are provided a form during his or her shift or tour of duty.

6)    If an IGP Form 1 cannot be obtained, an inmate/offender may submit his or her grievance on standard, letter-sized paper. This grievance should contain the following information:

a)    The name and DOC number of inmate/offender filing the grievance;

b)    The name of the institution or community correctional center where the inmate/offender is housed;

c)    The nature of the complaint or grievance, date of occurrence, and the remedy sought;

d)    The inmate/offender's signature; and

e)    Date.

7)   Whenever a grievance does not receive a response within the prescribed response time as established in this PS:

a)   The inmate/offender may attach a copy of the grievance to the IGP Form 2 or 3 as is appropriate and forward it to the next step in the grievance process for response.

b)   An inmate/ offender may waive this right if he or she has agreed in writing to an extension of the allowable response time.

c)   The specific length of the extension shall also be stated in writing.

8)   An inmate/offender's failure to adhere to any of the prescribed requirements of this PS can result in a grievance being dismissed.  However, if an inmate/offender can provide and explanation why they do not have a receipt or if they are appealing to the next level due to no response within the time limit allotted and is without a decision for the level below, these irregularities will be excused.

9)   Complaints listed as non-grievance issues shall also be dismissed.

## 15.   PROCEDURES FOR FILING AN INMATE/OFFENDER GRIEVANCE

### a.   Inmates at CDF

1)   Each formal grievance must be filed within 15 calendar days of the incident that precipitates the filing of a grievance or within 15 days when the inmate/offender became knowledgeable of the incident that he or she believes has cause for filing of a grievance.

2)   Inmates/offenders shall use Blue IGP Form 1 (Attachment A) to file a grievance.  If an IGP Form 1 cannot be obtained, an inmate/offender may submit the grievance on standard, letter-sized paper.

3)   A secured IGP collection box shall be placed in a location accessible to all inmates.   The inmate/offender shall place the IGP form in the locked box marked "GRIEVANCES."

4)   Inmates housed in segregation units shall deposit the IGP form in the locked box marked "GRIEVANCES" during their individual recreation time.  An inmate in this status may also submit the IGP to their assigned case manager or a supervisor, having first placed the IGP form in a sealed envelope.  The case manager or supervisor shall then place the IGP form in the locked box marked "GRIEVANCES".

b.    Community Correctional Center

   1)   Inmates/offenders housed in contract halfway houses shall exhaust all provided remedies in the affected facility to include formal and informal resolution efforts.

   2)   Inmates/offenders housed in contract halfway houses may file an IGP with the DOC Community Residential Programs (CRP) Administrator

   3)   Offenders who are housed in a contract halfway house shall submit the IGP to the DOC Community Residential Administrator.

c.    **IGP Coordinator**

   1)   The IGP Coordinator or designee shall collect grievances from each CDF housing unit locked grievance box daily, Monday through Friday.

   2)   The CRP Administrator or designee shall receive IGPs through the mail.

   3)   The IGP Coordinator shall inform the inmate/offender in writing of the appropriate administrative procedure if the request or appeal is not acceptable under the IGP.

   4)   The IGP Coordinator shall generate the inmate/offender receipt using the Crystal Report "G – IGP Grievance Receipt" (Attachment B).

   5)   The IGP Coordinator shall forward the inmate/offender receipt via the institutional mail.

   6)   The IGP Coordinator shall input required complaint data into the JACCS "Grievance" Data Entry Screen (See Attachment C) to include:

      a)   Grievance Entry Information - The IGP Codes (Attachment D) shall be used for the JACCS Grievance Type code to indicate the subject of the complaint in order to permit efficient reporting, tracking and monitoring of all inmate/offender complaints, on all IGP logs and reports.

      b)   Submitted for Review Information

      c)   Referred to Investigation

      d)   Extension of Time requested and new date for response if the inmate/offender consents

      e)   Finding Response

      f)   Final Appeal Ruling (when applicable)

7)    The IGP Coordinator shall scan the IGP document image into JACCS.

8)    The IGP Coordinator shall then forward the complaint to the appropriate manager for investigation and resolution, along with a photocopy to the affected Warden.

d.   **Investigation**

1)    Staff who are implicated or involved in a grievance are prohibited from investigating that grievance.

2)    The manager shall impartially investigate the complaint and make every effort for reasonable resolution. Resolution may result in a further assessment and improvement of management or operational controls.

3)    Inmates/offenders may not participate in the resolution of an inmate's/offender's grievance.

e.   **Response to IGP**

1)    The manager shall provide a written response in memorandum format via the IGP Coordinator to inmate/offender grievances within 21 calendar days following receipt of the grievance.

2)    The affected Warden shall review and approve/disapprove or otherwise revise the response.

3)    Inmates/offenders shall be provided with written justification for any decision that is rendered on their grievance or grievance appeal.

4)    Upon satisfactory completion of the complaint resolution, the Warden shall return the IGP to the IGP Coordinator for distribution to the inmate.

5)    In any instance when the IGP Coordinator, in consultation with the affected Warden and the investigating manager, determines that a sufficient response to a grievance cannot be rendered within the prescribed time limitation, the following conditions apply:

a)    The affected inmate/offender must be notified in writing of the need for the extension and of the specific length of the extension.

b)    The inmate/offender must agree in writing to the extension.

c)    Otherwise, when a grievance does not receive a response within the prescribed response time, as established in this PS, the

inmate/offender may proceed to the next step in the grievance
procedure.

16. **PROCEDURES FOR FILING AN APPEAL**

   a. **Central Detention Facility**

      1) If an inmate housed at the CDF is not satisfied with the Warden's response to
a grievance, he or she may file an appeal to the Deputy Director.

      2) This appeal shall be filed within 5 calendar days of receipt of the grievance
response from the Warden, using Green IGP Form 3 (Attachment F). The
appeal shall be accompanied by a copy of the original grievance and the
Warden's response and supporting documentation. If an IGP Form 3 cannot
be obtained, an inmate/offender may submit the grievance on standard letter-
size paper.

      3) The Deputy Director shall respond to an appeal within 21 calendar days
following its receipt.

   b. **Corrections Corporation of America Correctional Treatment Facility**

      1) Inmates/offenders housed in the CTF shall exhaust all provided remedies in
the affected facility to include formal and informal resolution efforts.

      2) The CCA Warden shall ensure that sufficient grievance and appeal forms are
available on the housing units at the CTF.

      3) If the inmate/offender is not satisfied with his or her response from the CTF
Warden he or she may file an appeal to the Deputy Director within 5 calendar
days, using Green IGP Form 2 (Attachment F) or plain letter-size paper. If an
IGP Form 2 cannot be obtained, an inmate/offender may submit the grievance
on standard letter-size paper. This appeal must be accompanied by copies of
the original grievance and responses, and appropriate support documentation,
from the CCA/CTF Warden.

      4) The Deputy Director or designee shall investigate and respond to the appeal
within 21 calendar days following its receipt.

   c. **Contract Community Correctional Center**

      1) If an inmate/offender housed in a contract community correctional center is
not satisfied with his or her response from the CRP Administrator he or she
may file an appeal to the Deputy Director within 5 calendar days, using Pink
IGP Form 2 (Attachment E). If an IGP Form 3 cannot be obtained, an

inmate/offender may submit the grievance on standard letter-size paper. This appeal must be accompanied by copies of the original grievance and responses, and appropriate support documentation, from the CRP Administrator.

    2)    The Deputy Director or designee shall respond to the appeal within 21 calendar days following its receipt.

**d.   Appeals Process – Final Level**

    1)    As a final appeal, an inmate/offender housed in a correctional facility under the jurisdiction of or contract with DOC, who is dissatisfied with an appeal decision rendered by the Deputy Director may submit his or her grievance to the Director within 5 calendar days following the receipt of a grievance appeal response.

    2)    The Yellow IGP Form 4 (Attachment G) shall be used for filing an appeal to the Director. Appeals to the Director must be accompanied by the original grievance along with the corresponding responses. If an IGP Form 4 cannot be obtained, an inmate/offender may submit the grievance on standard letter-size paper.

    3)    The Director shall respond to an inmate's/offender's appeal within 21 calendar days following its receipt.

    4)    The Director shall be the final level of appeal for each inmate/offender who files a Grievance within the DOC Inmate Grievance Procedure.

**17.   PROCEDURES FOR FILING AN EMERGENCY GRIEVANCE**

    a.    Emergency grievances shall be defined as matters in which an inmate/offender would be subjected to substantial risk of personal injury, or serious and irreparable harm, if the inmate/offender filed the grievance in the routine manner with the normally allowed response time.

    b.    The inmate/offender must prominently label and identify the grievance as an "Emergency Grievance" at the top of the IGP Form 1 and state the nature of the emergency.

    c.    The inmate/offender shall file the emergency grievance in a sealed envelope; also marking it as an emergency grievance. The inmate/offender shall address his or her Emergency Grievance to the lowest administrative level at which an appropriate remedy can be achieved (i.e., CRP Administrator, Warden, or Director).

d.   If an inmate's/offender's grievance is of a sensitive nature and he/she has reason to believe that he/she would be adversely affected if it was to become known at the institutional level, he/she may file the grievance directly with the Director. All such Emergency Grievances may be forwarded via the regular institutional mail.

e.   The IGP Coordinator shall immediately review and consult with the Warden, or Administration/CRP Administrator to determine if the complaint is of an emergency nature as defined in this directive.

f.   The inmate shall be informed if the grievance is not accepted as an emergency grievance and that the grievance shall be treated as a regular grievance.

g.   The following special provisions shall apply to Emergency Grievances:

1)   An emergency grievance shall be responded to within 72 hours of its receipt.

2)   Within 48 hours of receiving a response to the emergency grievance, an inmate/offender may appeal to the next level of the IGP appeal process.

18.  **REPORTING**

a.   Each IGP Coordinator shall print the Crystal Report "G – IGP Complaint Log" (Attachment H) that records all formal grievances entered in JACCS under the IGP. Not later than the 10th day of each month, a copy of this log, reflecting grievances filed during the previous month, shall be forwarded through the affected Deputy Director.

b.   Each DOC official who renders a decision on an Inmate Grievance Appeal shall print the Crystal Report "G – IGP Appeal Log" (Attachment I) that records all appeals entered in JACCS under the IGP. Not later than the 10th day of each month, a copy of this log, that reflects appeals filed during the previous month, shall be forwarded through the affected Deputy Director to the Director.

c.   The IGP Coordinator shall print the Crystal Report "G – Unresolved Grievance Log" (Attachment J) that tracks and monitors the progress of grievances remaining unresolved more than 22 days after receipt. Not later than the tenth 10th day of each month, a copy of this log, which reflects all unresolved grievances, shall be forwarded through the affected Deputy Director to the Director.

d.   All records, logs, and reports that pertain to an inmate/offender grievance shall be maintained in accordance with the DOC Records Retention and Disposal Schedule.

19. **EVALUATION**

a. **Internal Program Review.** When managers determine that the results of an inmate/offender grievance point to systemic deficiencies, appropriate improvements shall be taken. Improvements may include recommendations for procedural changes to correct systemic problems, refresher training, counseling or discipline when the investigation findings clearly point to this as the appropriate action.

b. **Annual Statistical Summary Report.** The Office of Management Information and Technology Services shall maintain the database and provide an annual statistical summary of the DOC IGP and submit it to the Director and the Office of Internal Controls, Compliance and Accreditation. This summary shall be provided by the 21st day of October for the preceding fiscal year.

c. At a minimum, the reviews described above, shall include assessments of the following operational factors:

1) Compliance with Response Time – An assessment to determine if inmate grievances are responded to within the prescribed time periods.

2) Availability of Forms – A determination of the accessibility and availability of the forms used to submit grievances.

3) Response to Grievances – An analysis to determine if appropriate responses and remedies are being provided in response to grievances.

4) Credibility of the System – An assessment of inmate knowledge of, satisfaction with, and confidence in the IGP.

5) Conclusions and Recommendations – An evaluation of the data generated through the IGP process (i.e., number of grievances, types of grievances filed, number and types of grievances by institutions). This data shall be used to develop specific conclusions and recommendations regarding Department operations and the DOC IGP.

d. **Senior Executive Review.** The designated senior executive manager assigned to evaluate the IGP process shall conduct not less than annual audits and monitor compliance at subsequent reviews.

e. **Risk Management.** The Risk Manager shall review crystal reports and annual audits and in conjunction with the Warden determine plans of action where warranted to improve safety, quality and program performance.

20. **CONFIDENTIALITY**

Records concerning an individual's participation in the IGP are considered confidential. These records shall be made available in accordance with the established procedures for confidential records and information, as contained in the D. C. Freedom of Information Act.

Odie Washington
Director

**ATTACHMENTS**

A.    Blue IGP Form 1 (Administrative Remedy to Warden/CRP Administrator)
B.    Crystal Report – "IGP Grievance Receipt"
C.    JACCS Grievance Data Entry Screen
D.    Grievance Codes
E.    Pink IGP Form 2 (CCC Inmate Appeal to Deputy Director)
F.    Green IGP Form 3 (CDF and CCA/CTF Inmate Appeal to Deputy Director)
G.    Yellow IGP Form 4 (Appeal to Director)
H.    Crystal Report - Monthly IGP Complaint Log (IGP Form 6)
I.    Crystal Report - Monthly IGP Appeal Log (IGP Form 7)
J.    Crystal Report - Unresolved IGP Log (IGP Form 8)

THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

PERDITA TAYLOR                          :

    Plaintiff                           :

    v.                                  :Case No.: 1:07-CV-01394 - RCL

D.C. DEPARTMENT OF CORRECTIONS, *et al.*  :

    Defendants                          :

### DECLARATION OF SGT. ADEN BUSHEE

I, Sgt. Aden Bushee, pursuant to 28 U.S.C., 1746, declare under penalty of perjury that the foregoing is true and correct:

1.    I am the Litigation Coordinator for the Department of Corrections (DOC). In this capacity, I assist the DOC General Counsel's Office in providing litigation support to the Office of Attorney General.

2.    I have reviewed the records of inmate Perdita Taylor DCDC 205088 to determine if she filed a formal grievance and/or exhausted her administrative remedies before filing the above-styled civil action.

3.    I have conducted a diligent search of the records pertaining to inmate Perdita Taylor. The result of the search is that Ms. Taylor has not filed any formal grievance with the DOC regarding the incident that occurred on or about November 18, 2006, pertaining to her complaint of medical negligence at the DC Jail.



EXHIBIT

D

4.  The DOC never received any notice in any form, prior to July 31, 2007, from or on behalf of Perdita Taylor, indicating that she intended to file a medical malpractice lawsuit against the DOC.

5.  I have provided this affidavit of my own free will and was neither coerced, threatened nor promised remuneration of any kind to do so.

Dated: 1/30/08

Sgt. Aden Bushee

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Perdita Taylor, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. |
| | ) |
| D.C. Department of Corrections | ) |
| and Unity Health Care, Inc., | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

## DECLARATION OF
## MEREDITH TORRES

1. I am an Attorney in the General Law Division, Office of the General Counsel, Department of Health and Human Services (the "Department"). I am familiar with the official records of administrative tort claims maintained by the Department as well as with the system by which those records are maintained.

2. The Department has a Claims Branch that maintains in a computerized database a record of administrative tort claims filed with the Department, including those filed with respect to federally supported health centers that have been deemed to be eligible for Federal Tort Claims Act malpractice coverage.

3. As a consequence, if a tort claim had been filed with the Department with respect to Unity Health Care, Inc. (formerly known as Health Care for the Homeless Project, Inc.), Central Detention Facility (CDF/DC Jail) located at 1901 D Street, Southeast, Washington, District of Columbia 20003, an approved delivery site, or its employees or qualified contractors, a record of that filing would be maintained in the Claims Branch's database.



EXHIBIT

E

4.  I caused a search of the Claims Branch's database to be conducted and found no record of an administrative tort claim filed by Perdita Taylor or an authorized representative relating to Unity Health Care, Inc., Central Detention Facility or Negash Tesemma, M.D.

5.  I have also reviewed official agency records and determined that Unity Health Care, Inc., was deemed eligible for Federal Tort Claims Act malpractice coverage effective January 1, 1994, and that its coverage has continued without interruption since that time.  Copies of the notifications by an Assistant Surgeon General, Department of Health and Human Services, to Unity Health Care, Inc., are attached to this declaration as Exhibit 1.

6.  Official agency records also indicate that Negash Tesemma, M.D., was an employee of Unity Health Care, Inc., at all times relevant to the complaint in this case.

I declare under penalty of perjury that the foregoing is true and correct.  28 U.S.C. § 1746.

Dated at Washington, D.C., this _4th_ day of _December_, 2007.

MEREDITH TORRES
Attorney, Claims and Employment Law Branch
General Law Division
Office of the General Counsel
Department of Health and Human Services